IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ROBERT E. BUTLER, )
)
    Plaintiff, )
)
v. ) Civil No. 10-607-WDS-CJP
)
MICHAEL J. ASTRUE, )
**Commissioner of Social Security,** )
)
    Defendant. )

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Robert E. Butler seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

M. Butler applied for benefits in March, 2006, alleging disability beginning on April 1, 1996. (Tr. 127, 132). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Lawrence D. Wheeler denied the application on July 2, 2009. (Tr. 43-51). Plaintiff's request for review was denied by the Appeals Council, and the

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

July 2, 2009, decision became the final agency decision. (Tr. 33).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

(1) The ALJ erred in weighing the medical evidence, specifically, in the weight he afforded to the opinions of plaintiff's treating doctor, Dr. Salem.

(2) The ALJ should have found that plaintiff had a severe mental impairment.

(3) The ALJ erred in his determination of plaintiff's credibility.

(3) The ALJ did not properly assess plaintiff's cervical spine condition.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).** If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the question for the Court is not whether Mr. Butler was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See,** ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing** ***Diaz v. Chater*, 55 F.3d 300, 306**

**(7th Cir.1995)).**

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).** In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

The ALJ incorrectly stated the alleged date of onset as 2006, rather than 1996, in several places. However, he analyzed the evidence beginning in 1995, and noted that Mr. Butler was insured for DIB only through December 31, 1997.

ALJ Wheeler followed the five-step analytical framework described above. He concluded that plaintiff's work activity since the alleged date of onset did not rise to the level of substantial gainful activity. He concluded that plaintiff has severe impairments of cervical and lumbar spine conditions. He found that Mr. Butler's alleged mental impairment was not severe. He found that his impairments do not meet or equal a listed impairment. (Tr. 44-46).

The ALJ discussed the fact that plaintiff had undergone treatment for drug and alcohol abuse, but found that his substance abuse had not precluded him from working for a period of more than 12 continuous months. (Tr. 45).

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a full range of medium work. (Tr. 46-49). Using the "grids," (20 C.F.R. Part 404, Subpart P, Appendix 2), he determined that plaintiff, who was a "younger individual" at the age of 41, was not disabled because he could do a full range of work at the medium level and had no nonexertional limitations. He made an alternative finding that, if he were restricted to the full range of work at the light or sedentary exertional level, in view of plaintiff's age, the grids would direct a finding of "not disabled" as well. (Tr. 49-50).

## **The Evidentiary Record**

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff.

**1.** **Agency Forms**

Mr. Butler was born in March, 1968. He was insured for DIB through December 31, 1997. (Tr. 135). His earnings records showed minimal income in the years 1998 and 2000. Other than those years, he had zero earnings for the years 1996 through 2008. (Tr. 136). His highest year was 1995, in which he earned $7,738.00. (Tr. 136).

Plaintiff had filed a previous application for disability benefits, which was denied on June 19, 1997. (Tr. 140).

Mr. Butler indicated that the only kind of work he had done since 1996 was odd jobs such as painting houses, mowing yards and landscaping. Previously, he had done factory work and had worked in a restaurant. (Tr. 143- 150). In another report, he said that he had worked as a laborer from 1989 through 1995, doing mowing, house painting, and general house repairs. (Tr.

161). He said that he had stopped working on December 31, 2005, because he was fired. He first became unable to work due to his condition on April 1, 1996. (Tr. 160).

In an Activities of Daily Living Questionnaire, plaintiff said that he lived with his parents. He said that he is unable to bend over when his back is "out of place" and that he has muscle spasms such that he cannot walk upright or carry anything. His back and neck pain comes and goes. He did not have a drivers license. He left his house 3 or 4 times a week to visit family and friends, do errands and keep appointments. He reported no difficulty in getting along with people. He said that he had trouble reading. He goes fishing when not in pain. (Tr. 151-158).

Plaintiff was in special education classes in school. The highest grade completed was GED. (Tr. 165-166).

**2.** **Evidentiary Hearing - June 3, 2009**

Plaintiff was represented at the hearing by an attorney. (Tr. 1).

Mr. Butler testified that he was unable to work due to low back and neck pain. (Tr. 7-8). He last used alcohol or drugs about 2 and ½ years prior, when he got his third DUI. (Tr. 8-9).

He last worked in the winter of 2006, when he drove a vehicle to Colorado for pay. (Tr. 10). The last time he worked 40 hours a week for more than 3 months was before his car accident in 2005. At the time of the accident, he was taking care of an elderly man. (Tr. 10-11).

Mr. Butler takes prescription pain medication. It helps, but does not totally get rid of the pain. He has had problems getting a medical card. (Tr. 12-13). He was living with his parents at the time of the hearing. He testified that he did not do much around the house, and did not do any outside work. If he does household repairs, he has to do a little at a time. (Tr. 14015). He denied doing odd jobs at the time of the hearing. (Tr. 15).

He did not file a claim earlier because he was drunk all the time. His daughter was severely injured in the car accident, and he and his wife lost everything. They got divorced, and he just gave up. (Tr. 20-21).

Plaintiff testified that he thinks he completed 6th or 7th grade. He went to high school, but was in "a learning disability, behavior disability classroom all day long." He did not get a GED. (Tr. 22-23).

He sleeps poorly due to pain and he has nightmares about the car accident and his father's suicide. He naps during the day. He is "wore out" due to pain, the medication, and his "nerves are shot." (Tr. 25-26). He testified that, if he could get medical care, he would have surgery on his neck and back. (Tr. 22).

The vocational expert testified that, if the limitations in Dr. Salem's report were accepted, plaintiff could not do any work. (Tr. 29-30).

### 3. Medical Records- Physical Impairments

Mr. Butler was involved in an automobile accident on November 29, 2005. He was seen in the emergency room with complaints of tightness in his neck and a burning feeling in his hands and fingers. X-rays showed no fractures of the cervical spine. (Tr. 250 -254). The next day, an MRI showed a small disc herniation at C5-6. Naprosyn and bed rest were prescribed. (Tr. 243-245).

Plaintiff was treated by Dr. George Schoedinger in late 1995 and early 1996. Dr. Schoedinger did testing, including a cervical myelogram, CT, and a discogram. (Tr. 255-268). Dr. Schoedinger concluded that, based on the discogram, "it is impossible to make a statement as to the cause of the patient's symptoms. (Tr. 256). On February 7, 1996, the doctor informed Mr.

Butler that he did not recommend surgery. He advised him to maintain a high level of activity. (Tr. 260).

Plaintiff was seen by a primary care physician at Murphysboro Health Center for neck and upper back pain in 1996 and 1997. On March 12, 1997, it was noted that he had been seeing a chiropractor. He was not working. There was a lawsuit pending regarding the accident. The diagnosis was chronic cervical strain. (Tr. 275-281). Plaintiff underwent physical therapy at St. Joseph Memorial Hospital in Murphysboro in 1997. On June 13, 1997, he told the therapist that he was "feeling fine and doing well in his every-day activities." (Tr. 298). He was discharged on July 11, 1997, having met 5 out of his 6 goals. He was to continue with a home exercise program "to regain strength/endurance to perform work activities in the future." (Tr. 297).

In May, 2001, plaintiff went to the emergency room for pain in his low back and numbness in his legs. (Tr. 333).

In June, 2004, plaintiff went to the emergency room for back pain which he said was getting worse and worse. He was seeing a chiropractor and taking Percocet. The medical records state that he "stands abnormally." He had muscle spasms. He was given Vicodin and Flexeril. (Tr. 674-679).

Mr. Butler was seen at the Abundant Health Resource Clinic on December 1, 2005, for complaints of low back pain radiating into his right leg. On examination, he had pain and tenderness from L5 to S1, radiating into his right leg. Straight leg raising was positive on both sides. He walked with a limp. The plan was for X-rays and chiropractic therapy. (Tr. 624).

X-rays of the lumbar spine were done on December 28, 2005. They showed small osteophytes but no other significant degenerative changes. There was no spondylolisthesis.

There was "probable spondylosis at L5." (Tr. 671).

Dr. Vidal Chapa did a consultative physical examination on June 19, 2006. Plaintiff told him that he had a learning disability and that he had attended the 8th grade. He told the doctor that he had 2 bulging discs in his neck and 1 bulging disc in his lower back. He denied any history of radicular type pain. He also denied any history of alcohol abuse. Physical examination was normal. Plaintiff had a full range of motion of his neck, back, shoulders, hips, ankles, elbows and wrists. He had no muscle spasms. Straight leg raising was negative on both sides. He had full muscle strength in both legs. Neurological examination was normal. His grip strength was full and equal. His gait was normal. There was no evidence of cervical or lumbar radiculopathy. (Tr. 459-464).

On July 19, 2006, state agency consultant Dr. C.A. Gotway completed a Physical RFC Assessment. This assessment was based on a review of medical records. He concluded that plaintiff had the physical RFC to perform a full range of work at the medium level (frequent lifting of 25 pounds and occasional lifting of 50 pounds with ability to sit, stand, or walk for 6 out of 8 hours, and unlimited ability to push/pull). (Tr. 479-486).

In January, 2007, plaintiff went to the emergency room complaining of pain in his right neck, shoulder, side and back. He said that he had driven a U-Haul to Colorado and unloaded some furniture, and had been in pain since then. However, he left the hospital without being seen. (Tr. 656-657).

Mr. Butler began seeing Dr. Anad Salem on February 14, 2007. He complained of pain in his right shoulder. He told the doctor that he had some bulging discs from a car accident about 8 years earlier, but he had "done fine for quite some time." (Tr. 517). He complained of

numbness and pain in a C4-5 pattern, which might result from bulging or ruptured discs in the neck. He was trying to get Medicaid to pay for testing. Dr. Salem prescribed Prednisone and Vicodin. (Tr. 518). The next month, he came to Dr. Salem's office to have Medicaid paperwork filled out. He complained of back pain and walked with a "very antalgic gait." (Tr. 519). In May, 2007, he presented with neck pain, numbness and tingling in his arms and shoulders, and shooting pain from his back down to his legs. He said he was doing relatively well until he drove for 8 days a few months prior. Also, he had been trying to work and had been lifting 40 pound bags of topsoil. In November of 2007, he was complaining of pain in his upper back and neck. He was still trying to get on Medicaid. (Tr. 521-522).

In March, 2008, Dr. Salem noted that plaintiff continued to complain of neck and back pain. He was going to a chiropractor. He said that he had muscle spasms. Dr. Salem ordered an MRI. (Tr. 523).

A lumbar MRI was done on March 18, 2008. This showed positive findings at 3 levels. There were bulging discs with posterior annular fissures at L3-4 and L5-S1, not causing central canal stenosis. At L4-5, a small disc bulge with posterior midline annular fissure, mild facet arthropathy and ligamentum flavum hypertrophy caused triangulation of the canal and moderate bilateral foraminal stenosis. The radiologist's impression was that L4-5 was the "most likely level to be clinically symptomatic." (Tr. 498-499).

On April 8, 2008, Dr. Salem told plaintiff to take a copy of the MRI report to the Public Aid office to see if he could "get some help for possible surgery." Dr. Salem also noted that plaintiff had been taking 5 Vicodin tablets a day, but he was supposed to take only 4, and he had run out. Dr. Salem instructed him that the dosage would not be changed, and that "he's had his

one chance, and this is not to be tolerated." (Tr. 524). In July, 2008, plaintiff said that his back pain was worse. He asked about chiropractic care, and Dr. Salem told him to take a copy of his MRI report to the chiropractor. (Tr. 525-526). In November, 2008, he complained of significant back pain and asked for an increase in his pain medication, which Dr. Salem refused. (Tr. 527-528).

Dr. Salem completed a form in December, 2008, in which he assessed plaintiff's condition. He opined that plaintiff could occasionally lift less than 10 pounds and could walk only 1 to 2 city blocks. He said that plaintiff could sit and stand/walk for a total of less than 30 minutes each per day. He indicated that plaintiff could never do activities such as bending or climbing, and could only occasionally stoop or kneel. He said that plaintiff needed back surgery as verified by the MRI done in March, 2008. (Tr. 529-536).

Mr. Butler was seen in Dr. Salem's office in early 2009. On January 2, 2009, he was wearing a back brace and told the physician's assistant that he had been seeing "a chiropractor friend of his." (Tr. 690-691). Plaintiff was seen by Dr. Salem on January 30, 2009. He told the doctor that he had "an acute exacerbation" and had been seeing a chiropractor. Dr. Salem advised him not to wear the back brace. The doctor reviewed his MRI from 2008, and noted that most of his pain was probably caused by the L4-5 angulation of the canal with foraminal stenosis. As plaintiff then had a medical card, Dr. Salem wrote that he would refer him for epidural injections. (Tr. 691-692).

There is no indication that Mr. Butler actually had an epidural injection. On February 11, 2009, Dr. Salem's assistant noted that Mr. Butler's Medicaid coverage had been discontinued and they were having trouble finding a neurosurgeon. (Tr. 694-695). In April, 2009, the

physician's assistant wrote a note urging the Department of Public Aid to reinstate Mr. Butler's Medicaid coverage so that he could get a referral to a neurosurgeon. (Tr. 735-736).

The last record from Dr. Salem is dated April 16, 2009. Plaintiff told the doctor that he was having difficulty getting disability and no longer had a Medical Card. He said he was still having pain and muscle spasms. Dr. Salem noted that he needed to be evaluated by a neurosurgeon, but he could not "get in anywhere because he is self pay." (Tr. 736-737).

**4.** **Medical Records-Mental Impairments and Substance Abuse**

Mr. Butler went to the emergency room twice in 2000 for extreme intoxication. (Tr. 307, 323).

On September 4, 2001, he went to the emergency room and said that he wanted to be treated at a detox center. He had been drinking alcohol and using cocaine and marijuana. His blood alcohol level was over 200. He was treated by Dr. Mattie Chamness, who admitted him for medical detoxification. Her plan was for him to go from the hospital into an alcohol treatment program. (Tr. 352-354). However, he was brought back to the emergency room by a sheriff's deputy on September 9, 2001. He was again extremely intoxicated. He had been drinking alcohol and had recently started taking Prozac. He wanted to kill himself. (Tr. 361-366). Dr. Chamness saw him and noted that he had refused to enter a rehab program the prior week. He had been drinking and smoking marijuana, and had become depressed. He told Dr. Chamness that he wanted to do one-on-one substance abuse treatment. He was admitted for detoxification, and Dr. Chamness made an appointment for him to see a psychiatrist immediately upon discharge. (Tr. 368-369).

Mr. Butler was seen by psychiatrist Dr. Walter Elliston beginning on September 10, 2001.

(Tr. 290). Dr. Elliston diagnosed a substance induced mood disorder, alcohol dependence and drug abuse. (Tr. 288). The plan was for him to attend a 30 day rehab program, but he declined to do so. (Tr. 285). He abstained from alcohol until December, 2001, when he relapsed. On December 9, 2001, plaintiff was brought to the emergency room by the police for evaluation and blood alcohol level testing before being taken to jail. (Tr. 382-384). His BAC was 306 MG/DL. (Tr. 386). He was last seen by Dr. Elliston on December 20, 2001. The doctor again recommended a substance abuse treatment program, which he declined. He said that he was being counseled by the pastor at his church. (Tr. 282). Dr. Elliston noted that his depressive symptoms had persisted even while he had not been drinking. (Tr. 283).

On various dates between June, 2000, and November, 2003, plaintiff was treated for alcohol dependence and drug abuse at The Fellowship House. (Tr. 699-733).

Plaintiff had additional visits to the emergency room for extreme intoxication or injuries suffered while intoxicated in January, 2002 (Tr. 562); May, 2002 (Tr. 618); June, 2002 (Tr. 604); October, 2002 (Tr. 592); January, 2003 (Tr. 392); May, 2003 (Tr. 398); August, 2003 (Tr. 577); September, 2003 (Tr. 413); October, 2004 (Tr. 424); August, 2005 (Tr. 440).

On June 5, 2004, his mother took him to the emergency room after finding him crying. He had used methadone, methamphetamine, marijuana and Norco. He signed out against medical advice. (Tr. 684-687).

Harry J. Deppe, Ph.D., performed a consultative psychological examination on June 19, 2006. Dr. Deppe reported that Mr. Butler's mood and affect were unremarkable. He had no formal thought disorders. He had no difficulty staying on task. He was oriented and his memory for recent and remote events was good. His abstract reasoning skills were adequate. He was able

to perform simple calculations.  Mr. Butler denied current or past suicidal ideation.  He told Dr. Deppe that he was an alcoholic, but that he had not used alcohol for about 10 months.  He said that he was seeking disability because of back pain and that he had not been treated by a psychiatrist and was not taking any psychotropic medication.  Dr. Deppe diagnosed him with polysubstance dependence, in partial remission, and personality disorder, not otherwise specified.  Dr. Deppe opined that he had intact ability to relate to others, to understand and follow simple instructions, to maintain attention required to perform simple, repetitive tasks, and to withstand the stresses and pressures of day-to-day work activity.  (Tr. 455-458).

On July 19, 2006, state agency consultant Margaret Wharton, Psy. D., completed a Psychiatric Review Technique form.  She concluded that he did not have a severe mental impairment.  (Tr. 465-478).

From April through September, 2008, plaintiff attended "DUI classes" at Perry County Counseling.  He reported that he used no alcohol or drugs during that time.  (Tr. 500-516).

In January, 2009, Dr. Salem noted a diagnosis of alcoholism, but also noted "not drinking."  (Tr. 734).

## **Analysis**

Plaintiff first takes issue with the manner in which the ALJ handled the opinion of Dr. Salem.  At Tr. 49, ALJ Wheeler rejected Dr. Salem's opinion for the following reasons: (1) the doctor did not offer many objective findings, instead "relying on the MRI and on the claimant's complaints"; (2) plaintiff "almost always" was without neurological deficit and had full range of motion of the spine; (3) lack of "material trauma" since 1995; and (4) plaintiff's activities.  After rejecting Dr. Salem's opinion, the ALJ accepted the state agency consultant's opinion that

plaintiff was capable of medium work. That opinion was rendered almost two years before the MRI was done.

ALJ Wheeler was required to evaluate the treating doctor's opinion and determine what weight to give it considering the factors set forth in 20 C.F.R. §404.1527(d). An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §404.1527(d). **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010)**, citing **Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010).**

Here, the ALJ did not give good reasons for rejecting Dr. Salem's opinion, and he did not discuss the checklist of regulatory factors. The ALJ's first reason, that Dr. Salem offered "little in terms of objective findings" is difficult to understand, since the ALJ goes on to acknowledge that Dr. Salem relied on the MRI that was done in May, 2008. The ALJ offered no explanation of why he thought that the MRI results did not support Dr. Salem's opinion. In his brief, the Commissioner argues that the MRI "did not provide significant support for Dr. Salem's opinion as it mainly consisted of minimal and mild findings." Doc. 24, p. 7.

There are two problems with the Commissioner's argument. First, this reasoning was not advanced by the ALJ in his decision. See, **Campbell v. Astrue, 627 F.3d 299, 307 (7th Cir. 2010); McClesky v. Astrue, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision...")**. Secondly, there is no medical evidence in the file from which the ALJ could have concluded that the MRI did not support Dr. Salem's opinion. Dr. Salem is the only doctor (other than the radiologist who read the study) to have reviewed the MRI. It would have been improper

for the ALJ to have drawn his own independent medical conclusions about whether the MRI supported Dr. Salem's opinion. *Myles v. Astrue,* **582 F.3d 672, 677-678 (th Cir. 2009).**

In addition, the ALJ's statement that plaintiff "almost always" had no neurological deficit and a full range of motion does not accurately sum up the medical records. It is true that Dr. Chapa made those findings in his consultative exam in June, 2006. However, in the previous December, plaintiff had complained of radiating leg pain and walked with a limp; straight leg raising was positive. See, Tr. 624. The ALJ's statement also ignores the occasions on which plaintiff complained to health care providers about numbness and radiating pain. See, Tr. 333, 521, 624. An ALJ errs when he selectively discusses the medical evidence, ignoring the parts that conflict with his decision. *Godbey v. Apfel*, **238 F.3d 803, 808 (7th Cir. 2000);** *Myles v. Astrue*, **582 F.3d 672, 678 (7th Cir. 2009).** Such a selective view of the medical evidence is not a good reason for rejecting Dr. Salem's opinion.

The third reason, lack of "material trauma since the 1995 accident," is, again, difficult to understand. The ALJ offered no explanation for how a lack of trauma since 1995 would undermine Dr. Salem's opinion.

The ALJ "noted" plaintiff's activities. At Tr. 47, the ALJ said that plaintiff did odd jobs, drove for some days, and played basketball for 2 hours in 1997.[2] He did not explain how ability to do these activities is inconsistent with Dr. Salem's opinion. The Seventh Circuit has pointed out that there are "critical differences between activities of daily living and activities in a full-time job," and has said that "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, **671 F.3d 640, 647 (7th Cir. 2012), and case cited therein**.

---

[2]The physical therapy records actually say that plaintiff played basketball for 1 hour and he was "feeling sore from that." (Tr. 298).

Lastly, the ALJ said that Dr. Salem's opinion was undermined by his reliance on plaintiff's statements. This dovetails with plaintiff's third point regarding the ALJ's credibility analysis.

Plaintiff is correct in arguing that the credibility analysis was lacking. The Seventh Circuit recently reiterated that the ALJ must determine a claimant's credibility by considering the factors set forth in 20 C.F.R. §404.1529(c) and must support his credibility findings with evidence in the record. "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." **Shauger v. Astrue, No. 11-3232, slip op. at 9 (7th Cir., March 22, 2012)**.

Here, the reasons given by the ALJ for doubting the truth of Mr. Butler's statements are not supported by the record. The ALJ said that plaintiff gave inconsistent statements about his educational history, but at the hearing Mr. Butler tried to explain that he was in a special education classroom for high school but his classes were at the 6th or 7th grade level. The ALJ also said that plaintiff gave inconsistent answers as to when he had last worked, but the ALJ acknowledged that he was likely confused as to the dates. More importantly, the ALJ again relied on plaintiff's activities, which, as explained above, do not establish that plaintiff is capable of full-time work. While it is proper for an ALJ to consider daily activities, the ALJ "must explain perceived inconsistencies between a claimant's activities and the medical evidence.." *Jelinek v. Astrue*, **662 F.3d 805, 812 (7th Cir. 2011)**. In that case, the Seventh Circuit said that, in the absence of an explanation, it was "hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations." *Ibid*. The same is true here.

Further, the ALJ said that plaintiff has had only conservative treatment, but this ignores

the fact that Dr. Salem thought he should have epidural injections and wanted him to be seen by a neurosurgeon, but lack of medical insurance or Medicaid coverage made that impossible. Additionally, the ALJ first said plaintiff had "historically" used only over-the-counter medications, but then later acknowledged at Tr. 49 that Dr. Salem "prescribed strong pain medications."

In sum, the ALJ did not perform the credibility analysis required by 20 C.F.R. §404.1529(c), and the reasons he gave for not believing plaintiff's statements are not supported by evidence in the record. The ALJ failed to build the required "logical bridge from evidence to conclusion." *Vilano v. Astrue,* **556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.**

The Court also notes that the ALJ made several mistakes in his review of the evidence. At Tr. 44 and Tr. 46, he said that plaintiff was insured for DIB through December 31, 2007, but the correct date is December 31, 1997. See, Tr. 137-138. At Tr. 47, he said that a third party function report was filed by plaintiff's son, but it was really his mother. See, Tr. 168. At Tr. 47, he said that plaintiff was released from physical therapy in 2007. The correct year was 1997. See, Tr. 297. At Tr. 47, the ALJ referred to a 2005 car accident, but the accident was in 1995. None of these errors is particularly significant but, taken together, they suggest that the ALJ's review of the record was not as exacting as it should have been.

Both the weighing of the medical evidence and the analysis of plaintiff's credibility were erroneous, and the two issues were intertwined. The ALJ's errors require remand. Because the other points raised by plaintiff depend in large part on the weighing of the medical evidence and plaintiff's credibility, the above errors undermine the reliability of the ALJ's decision in those areas as well.

The ALJ's errors require remand. However, it should be clear that this Court is not

making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can only be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, *Shalala v. Schaefer*, **509 U.S. 292, 296-298 (1993);** *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate. Upon remand pursuant to sentence four, judgment must be entered. *Shalala v. Schaefer*, **509 U.S. 292, 297-298 (1993)**.

### Recommendation

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **April 30, 2012**

**Submitted: April 13, 2012.**


                                           s/ Clifford J. Proud
                                           **CLIFFORD J. PROUD**
                                           **UNITED STATES MAGISTRATE JUDGE**